**IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
GAINESVILLE DIVISION**

**CORRY M. MANSELL,**

      **Plaintiff,**

**vs.**                  **Case No. 1:17cv75-CAS**

**NANCY A. BERRYHILL,
Acting Commissioner of Social
Security,**

      **Defendant.**

_____/

## MEMORANDUM OPINION AND ORDER

This Social Security case was referred to the undersigned upon

consent of the parties by United States District Judge Mark E. Walker.

ECF No. 9.   It is now before the Court pursuant to 42 U.S.C. § 405(g) for

review of the final determination of the Acting Commissioner

(Commissioner) of the Social Security Administration (SSA) denying

Plaintiff's Title II application for period of disability and Disability Insurance

Benefits (DIB) and Title XVI application for Supplemental Security Income

(SSI).   After careful consideration of the record, the decision of the

Commissioner is affirmed.

## I. Procedural History

On or about July 31, 2012, Plaintiff, Corry M. Mansell, applied for DIB and SSI benefits with an alleged onset date of March 5, 2010, based on bipolar disorder and anxiety.   Tr. 13, 280-87, 311, 315.[1]   Plaintiff's last date insured for DIB was March 31, 2014.   Tr. 28, 281.   Plaintiff's applications were denied initially on November 21, 2012, and upon reconsideration on February 22, 2013.   Tr. 13, 97-160.

On April 15, 2013, Plaintiff requested a hearing.   Tr. 13, 162-63.   On April 2, 2015, Administrative Law Judge (ALJ) Ken B. Terry, conducted the first of two video hearings in Jacksonville, Florida.   Tr. 13, 35-57.   Plaintiff appeared without representation from Gainesville, Florida.[2] Tr. 56-89.   Thereafter, Plaintiff was represented and on September 16, 2015, Plaintiff's representative filed a brief, Tr. 366-67, and the hearing re-

---

[1]   Citations to the transcript/administrative record, ECF No. 9, shall be by the symbol "Tr." followed by a page number that appears in the lower right corner of each page.

[2]   Plaintiff appeared at the initial hearing with his wife who was to offer testimony and perhaps act as his representative.   Tr. 37-38.   The ALJ advised Plaintiff that his wife could not testify and act as his representative.   *Id.*   Plaintiff requested a continuance of the hearing in order to obtain representation and provide additional information.   Tr. 38-41.   Nevertheless, the ALJ reviewed the existing evidence of record with Plaintiff and asked him whether he had additional medical records.   Tr. 43-56.   The ALJ also inquired of an attending observer regarding the status of other medical records.   Tr. 50-52.

convened on September 28, 2015, with Plaintiff appearing by video in

Gainesville, Florida, and the ALJ appeared in Jacksonville, Florida.   Tr. 13,

58-96.   Plaintiff testified and was represented by Martin J. Goldberg.

Tr. 13, 58, 62-90, 233-35.   Paul R. Dolan, an impartial vocational expert,

testified.   Tr. 13, 58-59, 89-95, 364-65 (Resume).

On October 23, 2015, the ALJ entered a decision concluding that

Plaintiff is not disabled.   Tr. 13-29.   On December 16, 2015, Plaintiff filed

a request for review of the ALJ's decision and filed a brief.   Tr. 7-9, 368-69.

On January 19, 2017, the Appeals Council denied Plaintiff's request for

review.   Tr. 1-6.   The ALJ's decision stands as the final decision of the

Commissioner.   *See* 20 C.F.R. § 404.981.

On March 16, 2017, Plaintiff filed a Complaint requesting judicial

review of the Commissioner's final decision.   ECF No. 1.   Both parties

filed memoranda of law, ECF Nos. 15, 16, which have been considered.

## II.  Findings of the ALJ

The ALJ made several findings relative to the issues raised in this

appeal:

1. "The claimant meets the insured status requirements of the Social
   Security Act through March 31, 2014."   Tr. 15.

2.  "The claimant has not engaged in substantial gainful activity [SGA] since March 5, 2010, the alleged onset date."   *Id.*

3.  "The claimant has the following severe impairments: bipolar disorder and anxiety."   *Id.*   The ALJ also considered Plaintiff's obesity in accordance with Social Security Ruling (SSR) 02-1p and determined that Plaintiff's obesity, in combination with other impairments, is "non-severe as it does not impose significant work-related limitations."   Tr. 15-16.

4.  "The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1."   Tr. 16.   The ALJ determined that Plaintiff's "mental impairments, considered singly and in combination, do not meet or medically equal the criteria of listings 12.04 and 12.06."[3]   *Id.*   The ALJ determined that Plaintiff has *mild* restriction in activities of daily living and *mild* difficulties in social functioning, *moderate* difficulties in concentration, persistence, or pace, and *no* episodes of decompensation, which have been of extended duration. Tr. 16-17.

5.  "[T]he claimant has the residual functional capacity [RFC] to perform a full range of light work at all exertional levels but with the following nonexertional limitations: Mentally, he is precluded from performing complex tasks but is capable of simple, routine tasks consistent with unskilled work with concentration for those tasks for 2 hour periods and normal breaks and a lunch."   Tr. 18-27; *see infra* at n.7.

6.  "The claimant is unable to perform any past relevant work" as a sales agent, insurance and sales representative, office machines. Tr. 27.

---

[3]   Plaintiff argued to the ALJ that Plaintiff "has documented elements of Listings 12.04 and 12.06, Tr. 62, 367, but does not argue that the ALJ's determination at this step of the sequential evaluation process was error.   ECF No. 15.

7. The claimant was 37 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date; he has at least a high school education and is able to communicate in English.   Tr. 28.

8. There are jobs that exist in significant numbers in the national economy that the claimant can perform.   *Id.*   The ALJ determined that Plaintiff's ability to perform at all exertional levels has been compromised by nonexertional limitations.   *Id.*   As a result, the vocational expert was asked whether jobs exist in the national economy which Plaintiff can perform.   The vocational expert testified that Plaintiff was capable of performing several representative jobs including cleaner, commercial or institutional; warehouse worker; and router.   *Id.*   These jobs have heavy, medium, and light exertion levels, respectively, SVP's of 2, and are unskilled.[4]   Tr. 28, 92-93.

9. "The claimant has not been under a disability, as defined in the Social Security Act, from March 5, 2010, through the date of this decision."   Tr. 29.

---

[4]   "Unskilled work is work which needs little or no judgment to do simple duties that can be learned on the job in a short period of time."   20 C.F.R. § 404.1568(a).   A Specific Vocational Preparation (SVP) of 2 means "[a]nything beyond short demonstration up to and including 1 month."   Dictionary of Occupational Titles (DOT) (4th ed., rev. 1991), Appendix C: Components of the Definition Trailer, § II, SVP. "[SVP] is defined as the amount of lapsed time required by a typical worker to learn the techniques, acquire the information, and develop the facility needed for average performance in a specific job-worker situation."   *Id.*   Unskilled work corresponds to an SVP of 1 and 2.   SSR 00-4p, 2000 SSR LEXIS 8, at *8 (Dec. 4, 2000).   Further, unskilled work is work involving understanding, remembering, and carrying out simple instructions; making simple work-related decision; dealing with changes in a routine work setting; and responding appropriately to supervision, co-workers, and usual work situations.   SSR 85-15, 1985 SSR LEXIS 20, at *10-11 (1985).   In part, "[l]ight work involves lifting no more than 20 pounds at a time with frequent lifting or carrying objects weighing up to 10 pounds."   20 C.F.R. § 404.1567(b).

## III.   Legal Standards Guiding Judicial Review

This Court must determine whether the Commissioner's decision is supported by substantial evidence in the record and premised upon correct legal principles.   42 U.S.C. § 405(g); Chester v. Bowen, 792 F.2d 129, 131 (11th Cir. 1986).   "Substantial evidence is more than a scintilla, but less than a preponderance.   It is such relevant evidence as a reasonable person would accept as adequate to support a conclusion."   Bloodsworth v. Heckler, 703 F.2d 1233, 1239 (11th Cir. 1983) (citations omitted); *accord* Moore v. Barnhart, 405 F.3d 1208, 1211 (11th Cir. 2005).   "The Commissioner's factual findings are conclusive if supported by substantial evidence."   Wilson v. Barnhart, 284 F.3d 1219, 1221 (11th Cir. 2002) (citations omitted).[5]

"In making an initial determination of disability, the examiner must

---

[5]   "If the Commissioner's decision is supported by substantial evidence we must affirm, even if the proof preponderates against it."   Phillips v. Barnhart, 357 F.3d 1232, 1240, n.8 (11th Cir. 2004) (citations omitted).   "A 'substantial evidence' standard, however, does not permit a court to uphold the Secretary's decision by referring only to those parts of the record which support the ALJ.   A reviewing court must view the entire record and take account of evidence in the record which detracts from the evidence relied on by the ALJ."   Tieniber v. Heckler, 720 F.2d 1251, 1253 (11th Cir. 1983). "Unless the Secretary has analyzed all evidence and has sufficiently explained the weight he has given to obviously probative exhibits, to say that his decision is supported by substantial evidence approaches an abdication of the court's 'duty to scrutinize the record as a whole to determine whether the conclusions reached are rational.'"   Cowart v. Schweiker, 662 F.2d 731, 735 (11th Cir. 1981) (citations omitted).

consider four factors: '(1) objective medical facts or clinical findings; (2) diagnosis of examining physicians; (3) subjective evidence of pain and disability as testified to by the claimant and corroborated by [other observers, including family members], and (4) the claimant's age, education, and work history.'" Bloodsworth, 703 F.2d at 1240 (citations omitted). A disability is defined as a physical or mental impairment of such severity that the claimant is not only unable to do past relevant work, "but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 423(d)(2)(A). A disability is an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); *see* 20 C.F.R. § 404.1509 (duration requirement).[6] Both the "impairment" and the "inability" must be expected to last not less than 12 months.

---

[6] The relevant DIB and SSI regulations are virtually identical. As a result, citations will be made to the DIB regulations found at 20 C.F.R. §§ 404.1500-404.1599, unless a SSI regulation provides otherwise. The parallel regulations are found at 20 C.F.R. §§ 416.900-416.999, corresponding to the last two digits of the DIB citations, e.g., 20 C.F.R. § 404.1563(c) corresponds to 20 C.F.R. § 416.963(c).

<u>Barnhart v. Walton</u>, 535 U.S. 212 (2002). In addition, an individual is entitled to DIB if he is under a disability prior to the expiration of his insured status. *See* 42 U.S.C. § 423(a)(1)(A); <u>Moore v. Barnhart</u>, 405 F.3d at 1211; <u>Torres v. Sec'y of Health & Human Servs.</u>, 845 F.2d 1136, 1137-38 (1st Cir. 1988); <u>Cruz Rivera v. Sec'y of Health & Human Servs.</u>, 818 F.2d 96, 97 (1st Cir. 1986).

The Commissioner analyzes a claim in five steps. 20 C.F.R. § 404.1520(a)(4)(i)-(v):

1. Is the individual currently engaged in substantial gainful activity [SGA]?

2. Does the individual have any severe impairments?

3. Does the individual have any severe impairments that meet or equal those listed in Appendix 1 of 20 C.F.R. Part 404, Subpart P?

4. Does the individual have the RFC to perform work despite limitations and are there any impairments which prevent past relevant work?[7]

---

[7] An RFC is the most a claimant can still do despite limitations. 20 C.F.R. § 404.1545(a)(1). It is an assessment based upon all of the relevant evidence including the claimant's description of her limitations, observations by treating and examining physicians or other persons, and medical records. *Id.* Although an ALJ considers medical source opinions, the responsibility for determining claimant's RFC lies with the ALJ. 20 C.F.R. § 404.1546(c); *see* SSR 96-5p, 1996 SSR LEXIS 2, at *12 (July 2, 1996) ("The term "*residual functional capacity assessment*" describes an adjudicator's finding about the ability of an individual to perform work-related activities. The assessment is based upon consideration of all relevant evidence in the case record, including medical evidence and relevant nonmedical evidence, such as observations of lay witnesses of an individual's apparent symptomatology, an

5. Do the individual's impairments prevent other work?

A positive finding at step one or a negative finding at step two results in disapproval of the application for benefits. A positive finding at step three results in approval of the application for benefits. At step four, the claimant bears the burden of establishing a severe impairment that precludes the performance of past relevant work. Consideration is given to the assessment of the claimant's RFC and the claimant's past relevant work. If the claimant can still do past relevant work, there will be a finding that the claimant is not disabled. If the claimant carries this burden, however, the burden shifts to the Commissioner at step five to establish that despite the claimant's impairments, the claimant is able to perform other work in the national economy in light of the claimant's RFC, age, education, and work experience. Phillips, 357 F.3d at 1237; Jones v. Apfel, 190 F.3d 1224,

---

individual's own statement of what he or she is able or unable to do, and many other factors that could help the adjudicator determine the most reasonable findings in light of all the evidence."); *see also* Cooper v. Astrue, 373 F. App'x 961, 962 (11th Cir. 2010) (unpublished) (explaining claimant's RFC determination "is within the province of the ALJ, not a doctor"). The Court will apply the SSR in effect when the ALJ rendered her decision. *See generally* Bagliere v. Colvin, No. 1:16CV109, 2017 U.S. Dist. LEXIS 8779, at *10-18, (M.D. N.C. Jan. 23, 2017), *adopted*, 2017 U.S. Dist. LEXIS 51917 (M.D. N.C. Feb. 23, 2017).

1229 (11th Cir. 1999); Chester, 792 F.2d at 131; MacGregor v. Bowen, 786

F.2d 1050, 1052 (11th Cir. 1986); 20 C.F.R.

§ 404.1520(a)(4)(v).   If the Commissioner carries this burden, the claimant

must prove that he or she cannot perform the work suggested by the

Commissioner.   Hale v. Bowen, 831 F.2d 1007, 1011 (11th Cir. 1987).

As the finder of fact, the ALJ is charged with the duty to evaluate all

of the medical opinions of the record resolving conflicts that might appear.

20 C.F.R. § 404.1527.   When considering medical opinions, the following

factors apply for determining the weight to give to any medical opinion: (1)

the frequency of examination and the length, nature, extent of the treatment

relationship; (2) the evidence in support of the opinion, such as "[t]he more

a medical source presents relevant evidence to support an opinion,

particularly medical signs and laboratory findings, the more weight" that

opinion is given; (3) the opinion's consistency with the record as a whole;

(4) whether the opinion is from a specialist and, if it is, it will be accorded

greater weight; and (5) other relevant but unspecified factors.   20 C.F.R.

§ 404.1527(b) & (c).

The opinion of the claimant's treating physician must be accorded

considerable weight by the Commissioner unless good cause is shown to

the contrary.   Lewis v. Callahan, 125 F.3d 1436, 1440 (11th Cir. 1997).

This is so because treating physicians "are likely to be the medical

professionals most able to provide a detailed, longitudinal picture of your

medical impairment(s) and may bring a unique perspective to the medical

evidence that cannot be obtained from the objective medical findings alone

or from reports of individual examinations, such as consultative

examinations or brief hospitalizations."   20 C.F.R. § 404.1527(c)(2).   "This

requires a relationship of both duration and frequency."   Doyal v. Barnhart,

331 F.3d 758, 762 (10th Cir. 2003).

The reasons for giving little weight to the opinion of the treating

physician must be supported by substantial evidence, Marbury v. Sullivan,

957 F.2d 837, 841 (11th Cir. 1992), and must be clearly articulated.

Phillips, 357 F.3d at 1241.   "The Secretary must specify what weight is

given to a treating physician's opinion and any reason for giving it no

weight, and failure to do so is reversible error."   MacGregor, 786 F.2d at

1053.

The ALJ may discount a treating physician's opinion report regarding

an inability to work if it is unsupported by objective medical evidence and is

wholly conclusory.   Edwards v. Sullivan, 937 F.2d 580, 583-84 (11th Cir.

1991). Stated somewhat differently, the ALJ may discount the treating

physician's opinion if good cause exists to do so. Hillsman v. Bowen, 804

F. 2d 1179, 1181 (11th Cir. 1986). Good cause may be found when the

opinion is "not bolstered by the evidence," the evidence "supports a

contrary finding," the opinion is "conclusory" or "so brief and conclusory that

it lacks persuasive weight," the opinion is "inconsistent with [the treating

physician's own medical records," the statement "contains no [supporting]

clinical data or information," the opinion "is unsubstantiated by any clinical

or laboratory findings," or the opinion "is not accompanied by objective

medical evidence." Lewis, 125 F.3d at 1440; Edwards, 937 F.2d at 583

(citing Schnorr v. Bowen, 816 F.2d 578, 582 (11th Cir. 1987)). Further,

where a treating physician has merely made conclusory statements, the

ALJ may afford them such weight to the extent they are supported by

clinical or laboratory findings and are consistent with other evidence as to a

claimant's impairments. Wheeler v. Heckler, 784 F.2d 1073, 1075 (11th

Cir. 1986).

Further, when a claimant attempts to establish a disability based on

his subjective complaints, he must provide evidence of an underlying

medical condition in either objective medical evidence confirming the

severity of the alleged symptoms or that the medical condition reasonably could be expected to give rise to the alleged symptoms.  *See* 20 C.F.R. § 404.1529(a) and (b); Wilson, 284 F.3d at 1225-26.

Plaintiff bears the burden of proving he is disabled, and consequently, is responsible for producing evidence in support of his claim.  *See* 20 C.F.R. § 404.1512(a); Moore, 405 F.3d at 1211.

## IV.  Legal Analysis

**Substantial evidence supports the ALJ's determination that Plaintiff has the RFC to perform light work with limitations and, as a result, is capable of performing other work.**

### I.

Plaintiff argues that the ALJ erred when he did not give appropriate weight to the opinions of Sandra R. Jones, Ph.D., L.H.M.C., a treating mental health counselor; Robert M. Licata, M.D., a staff psychiatrist with Amen Clinic, Inc., who met with Plaintiff to review SPECHT studies and for a full neuropsychiatric evaluation; Vicci L. Cascioli, R.N., A.P., a treating acupuncturist, who treated Plaintiff for anxiety and depression; William E. Benet, Ph.D., Psy.D, a psychologist, who provided a consultative psychological exam; and Elias H. Sakris, M.D., a psychiatrist from Sarkis Family Psychiatry, who examined and treated Plaintiff and ultimately

provided a mental assessment form in 2015.   ECF No. 15.   Plaintiff

argues that each of these health care providers support his inability to work

and disability.

## II.

### PLAINTIFF'S PRE-HEARING AND HEARING STATEMENTS

The ALJ summarized Plaintiff's pre-hearing and hearing statements.

At the hearing, the claimant testified that he was 42 years old.   He
testified that he lives with his wife in a one-story house.   He testified
that he is 5'11" and weighs 259 pounds.   He stated that he has a
valid driver's license and drives on a daily basis.   He stated that he
drives to his parent's house, doctors' appointments and d [sic] to the
grocery store.   He denied having any problems driving.   He drove
himself to the hearing.   He testified that he has not worked since his
alleged onset date.   He stated that his wife works (and earns about
$33,00 [sic] per year) and his parents also help him pay necessary
bills.   He testified that he went to a job interview but was "jumping"
out of his skin due to anxiety.   He stated that he might be able to do
some self-employment but would need to be extremely flexible.

He alleged disability based upon mental issues that included anxiety
and bipolar disorder. He testified that he had a history of problems
prior to his alleged onset date with a nervous breakdown when he
was 21 years old.   At the time of his alleged onset date, he stated
that [he] was "very anxious" and went into a "manic phase" after
which he lost his license with a company that he was doing business
with at the time.   He testified that he was having bouts of grandeur
and spending money that he did not have (running up credit) and
ended up in the hospital twice.   He stated that he got "tased" three
times.   He described having some issues with the police during a
traffic stop in which he would not stop for an officer.

He testified that following this, he has been trying to get help for his

condition.    He testified that his ongoing symptoms include anxiety, depression and paranoid thoughts (affect his ability to leave house at times).    He testified that although he has been taking medications, "they did not get it right."    He stated that he did not start treating with Dr. Sarkis until 2011 and he feels that his medications are more "appropriate."    He denied any more manic episodes but stated that he has to keep things "in check" emotionally.    He alleged having a "mini breakdown" two years ago and again last summer but admitted he was not hospitalized either time (controlled with medications).

He testified that he [sic] for the past two weeks, he has been "real bad."    He stated that he was not showering or shaving and was avoiding taking care of his personal needs.   He stated that on better days, he might and go visit a friend (a mechanic) but that has been more rare.   He also talks to his siblings who live in Atlanta.   He testified that he tries to avoid social interaction, which has worsened since 2010 due to worsening anxiety.   He stated that during 2011 (and most of 2011), he would curl up in a ball and was would [sic] be unresponsive.

The claimant also described having "emotional fatigue."   He stated that social situations make him nervous now.   He stated that on bad days, he would send his wife in the grocery store.   He stated that he [sic] his anxiety just "varies" and is up/down.   He also alleged that his concentration has been impaired by his medications (currently taking Lamictal and Clonazepam).   He stated that he believed his medications were also causing weight gain (30-40 pound weight gain).   He stated that any "expectation" breeds stress and that is why he could not work.   He testified having sleep issues as well.

With regard to his activities of daily living, he stated that he sometimes is able to do household chores such as power washes his sidewalk or help a friend (run errands for him).   He testified that [sic] might go visit his mechanic friend to help him out for a couple of hours.   He admitted that he is able to do yard work.[8]

---

[8]   In evaluating Plaintiff's credibility, the ALJ may consider a claimant's daily

Tr. 18-19.

## Plaintiff's Work History

The ALJ considered Plaintiff's work history

which has been sporadic and characterized by rather low earnings over the past 15 years, which has certainly been considered in his overall credibility determination and does not bode well.   In addition, the undersigned notes that during his consultative exam, he was noted as vague when he was providing specifics of his alleged panic attacks and bipolar episodes (frequency and time), which also has been considered in part of his credibility determination.   In addition, the claimant's testimony regarding his paranoia and depression (severity and frequency) are simply not documented to the extent he has alleged.

Lastly, in addition to the limited objective medical evidence and limited treatment, the claimant has also had numerous activities that are inconsistent with the total inability to work.   The claimant lives independently with his wife whom he married earlier this year in February 2015.   While she is at work, he stays at home by himself during the day and does things around the house that include cleaning, making himself a sandwich, prepare the laundry, washing dishes and mowing the grass with the self-propelled lawnmower. He also admitted that he is able to shop for groceries at times and also sometimes attends his parent's church.   He testified having "good" days and "bad" days and that he is able to do more on a good day.   On good days, he testified that he power washes sidewalks, delivers things for his mechanic friend including picking up parts and

---

activities when assessing the credibility of the claimant's complaints.   Macia v. Bowen, 829 F.2d 1009, 1012 (11th Cir. 1987); 20 C.F.R. § 404.1529(c)(3)(i) (providing that daily activities are relevant and can be considered by the ALJ when evaluating a claimant's symptoms); *but see* Lewis v. Callahan, 125 F.3d 1436, 1441 (11th Cir. 1997) ("participation in everyday activities of short duration, such as housework or fishing" does not disqualify a claimant from disability).   A claimant's ability to do some work, even at a low level, "may indicate that [the claimant] is able to do more work."   Cooper v. Comm'r of Soc. Sec., 521 F. App'x 803, 808 (11th Cir. 2013) (unpublished).

taking them to his shop or going and getting food for his friend. The claimant admitted that he sees his friend 2-3 times a week but on occasion has not seen him for several weeks when he is feeling bad.

Tr. 26.

## III.

The ALJ noted "that the overall medical treatment has been rather sparse in light of [Plaintiff's] alleged onset date back in March 2010." Tr. 19. He was seen at Shands Vista Rehab in 2010 on two occasions with two admissions. *Id.*

## Baker Act Admissions

On June 6, 2010, Plaintiff was admitted via Baker Act after disturbing neighbors with a laser light, walking into traffic, and pointing to neighbors with a gun. Tr. 19. He had stopped taking Lexapro for three to four weeks and admitted that his parents had urged him to resume Lexapro. *Id.* He was given Seroquel and became more stable following treatment. He started on Lexapro for depression. He was very apologetic upon discharge; his paranoia had subsided; and he was psychologically stable upon discharge on June 8, 2010, with increased Global Assessment of

Functioning (GAF) score of 45.[9]   Tr. 19-20, 382-86.

On July 18, 2010, Plaintiff was admitted under the Baker Act for the
second time.   Tr. 20, 378-81.   He had stopped taking Wellbutrin two days
prior to admission; his GAF score was 40.   *Id.*   It was noted that he was
irritable and hyperverbal as well as grandiose at times for which he was
given Seroquel, which helped calm him down.   His mental status exam
indicated, in part, that "[h]is thought process was tangential but for the most

---

[9]   The American Psychiatric Association: *Diagnostic and Statistical Manual of
Mental Disorders* (DSM-IV-TR) (4th Ed. Text Revision 2000) includes the GAF Scale
that is primarily used by mental health practitioners.   The GAF Scale is used to report
"the clinician's judgment of the individual's overall level of functioning" (with regard to
only psychological, social, and occupational functioning) and "may be particularly useful
in tracking the clinical progress of individuals in global terms, using a single measure."
*See* DSM-IV-TR 32-34.   The GAF scale is divided into 10 ranges of functioning, each
with a 10-point range in the GAF scale.   *Id.*   *See* Nichols v. Astrue, Case No.
3:11cv409/LC/CJK, 2012 U.S. Dist. LEXIS 119347, at *26-29 (N.D. Fla. Aug. 7, 2012)
(discussing the GAF scale).   A score of 31-40 is defined as manifesting "[s]ome
impairment in realty testing or communication (e.g., speech is at times illogical, obscure,
or irrelevant)" or "major impairment in several areas, such as work or school, family
relations, judgment, thinking, or mood."   DSM-IV-TR at 34.   A GAF scale rating of 41-
50 is indicative of serious symptoms or any serious impairment in social, occupational
or school functioning.   *Id.*   A GAF scale rating of 51 to 60 indicates moderate
symptoms or moderate difficulty in social, occupational, or school functioning.   *Id.*   The
"Commissioner has declined to endorse the GAF scale for 'use in the Social Security
and SSI disability programs,' and has indicated that GAF scores have no 'direct
correlation to the severity requirements of the mental disorders listings.'"   Wind v.
Barnhart, 133 F. App'x 684, 692 n.5 (11th Cir. 2005) (unpublished) (citing 65 Fed. Reg.
50746, 50764-65 (Aug. 21, 2000)).   In the Fifth Edition of the *Diagnostic and Statistical
Manual of Mental Disorders* (DSM-5) (2013), "[i]t was recommended that the GAF be
dropped from DSM-5 for several reasons, including its conceptual lack of clarity (i.e.,
including symptoms, suicide risk, and disabilities in its descriptors) and questionable
psychometrics in routine practice.   In order to provide a global measure of disability, the
WHO DSM-5 (see the chapter "Assessment Measures")."   DSM-5 at 16.

part he was logical and was directable to the point."  Tr. 381.  "His content

no SI, no HI, no AVH, no delusions, psychosis.  His insight and judgment

seemed poor to fair.  His mini-mental status exam he got 30 out of 30."

*Id.*  He showed mild psychomotor retardation, intense eye contact, and

slightly pressured speech.  *Id.*  Discharge diagnoses included bipolar

disorder, type 2, most recent episode hypomanic; cluster B (most

specifically antisocial personality disorder); poor social support and coping

skills; and an assessed GAF score between of 40 and 50.  Tr. 20, 378,

381 (differential diagnosis included a GAF score between 45 and 55).

The ALJ noted that at the time Plaintiff

> was Baker Acted (in 2010) and other reported times of manic
> behavior in the past, this usually occurred during times when he was
> noncompliant with medications.  For instance, during both
> admissions, he admitted that he had stopped taking his Lexapro for
> 3-4 weeks and then for 2 days (Exhibit 2F/4, 10).  When he was
> evaluated in October 2011, the claimant reported that he stopped
> taking his Lexapro "cold turkey" and he then experienced a manic
> episode and spent an enormous amount of money in a very impulsive
> manner.  To stabilized [sic] his mood, he was asked to return to
> Lexapro and he admitted that his mood and behavior had returned to
> "normal" shortly after resuming his medications (Exhibit 9F/2).  He
> reported that in March 2010, he could no longer afford his medication
> and discontinued it again but within four weeks, began to feel nervous
> and restarted it.  After one week, he had another manic episode
> (Exhibit 9F/2).  These prior episodes suggest that with his
> medications, they certainly provided more stability as well.

Tr. 25-26.

## Sandra R. Jones, Ph.D., LHMC

Plaintiff began seeing Dr. Jones "intermittently since 2001 but more frequently from 2006 to 2009 (although no indication that there was any treatment in 2010 or following the claimant's alleged onset date)."  Tr. 20, 452-54.  (According to her August 1, 2010, letter, she last met with Plaintiff in 2009.  Tr. 454.)  The record contains two letters written by Dr. Jones, August 1, 2010, and January 25, 2013, an addendum to the earlier letter. *Id.*  The ALJ noted that there were no actual therapy/treatment notes attached to the letters and "the treatment with this provider has been rather sporadic and irregular since the alleged onset date (Exhibit 5F/3-4)." Tr. 23, 452-53.

On January 25, 2013, Dr. Jones wrote that in the past two years and four months she met with Plaintiff for two sessions in 2010, one session in 2011, 10 sessions in 2012 (after 13 months since the last visit and on an irregular basis), and one session in 2013.  Tr. 23, 452.  She noted "[i]n these 14 sessions there has been little significant sustainable progress. His progress tends to be slow and incremental.  Then when he seems to stabilize and move forward he becomes depressed again."  Tr. 452.  The ALJ noted, "that no actual therapy/treatment notes were attached [to the

January 25, 2013, letter] but regardless as acknowledged above, the treatment with this provider had been rather sporadic and irregular since the alleged onset date." Tr. 23 (citation omitted).

The ALJ gave Dr. Jones' August 1, 2010, statement, Tr. 454, "which was given after his two hospitalizations, limited weight. At that time, the claimant was more unstable. However, his condition has stabilized with treatment and after he resumed his medications as evidenced by the conservative treatment thereafter (Exhibits 8F, 11F)." Tr. 26-27.

Plaintiff argues that the ALJ did not give proper weight to Dr. Jones' opinion that Plaintiff had an inability to work because of severe limitations. ECF No. 15 at 2, 5, 6. In her January 25, 2013, letter, Tr. 452-53, Dr. Jones noted Plaintiff had been unable to acquire and hold a job, but she did not opine that he was unable to work. Tr. 453. Dr. Jones noted:

> He is intelligent but appears to be unable to implement his for [sic] goals and plans. For example, he has been working on developing an on-line business for two years but has not been able to get it off the ground. He wants a job with status and free use of his time and he avoids practical work to earn a living. He worked in insurance for a while and was able to focus and get along with people when he got arrested two years ago for aggressive and paranoid behavior he felt humiliated and says he has a record and can't get a job so focuses on this on-line job that he cannot get off the ground.

Tr. 452. The letter also details Plaintiff's therapeutic history and self-

reports of symptoms.   Tr. 452-53.   The ALJ properly considered the
January 25, 2013, letter in evaluating the medical evidence and properly
considered Dr. Jones' August 2010 statement in giving it "limited weight."
Tr. 23, 26-27.

### Sarkis Family Psychiatry (Sarkis)

On September 6, 2011, Plaintiff sought an evaluation from Sarkis of
his bipolar disorder.[10]   Tr. 20, 404.   Plaintiff reported feeling depressed for
the past nine months, but also admitted feeling depressed on and off all of
his life.   *Id.*   He denied having panic attacks; reported avoiding going
anywhere due to fear that there might be a police officer as well as
hypervigilance; he reported manic episodes in 2006 and 2010 when he
stopped taking Lexapro; and he denied any paranoia.   Tr. 20, 405.   The
mental status examination revealed he was oriented x 4; recent memory
intact, but remote memory impaired; and he was well-groomed and put
together intact.   His attention and concentration were sustained, however,
his mood was "depressed" and his affect was "blunted"; insight and
judgment were poor and eye contact was "fleeting."   He had "concrete

---

[10]   This was the first of many visits with Sarkis from September 2011 through
approximately August 2015.

thought process." Tr. 20, 410. He was diagnosed with bipolar disorder, most recent episode depressed, GAD, and PTSD and assessed a GAF score of 60. Tr. 20, 411; *see supra* at n.9.

Plaintiff continued to follow-up with Sarkis in 2011 (September 20, October 4 and 28, November 7, and December 9, 2011) for treatment consisting primarily of medication management. Tr. 20, 412-21. His current medications were Abilify and Cymbalta. Klonopin was added on October 4, 2011. Tr. 20, 412, 414. Generally, his mental status exam findings were unremarkable including normal thought process and speech and full orientation, except for down mood and flat affect and some mild impairment in attention and concentration. He continued to deny any panic attacks or paranoia and denied any side effects from his medications. Tr. 20, 412-21.

His clinical global impressions severity were moderate except for December 9, 2011, when it was noted as marked and his mood was bad; he had a full range of emotions and avoided eye contact. Tr. 420-21. He continued to deny any panic attacks or paranoia and denied any side effects from his medication. Tr. 20, 411-14, 418-19. Also on December 9th, he was advised to start psychotherapy particularly due to negative

thoughts, fear of going out and seeing people he knows and not wanting them to know his history of manic episodes. Tr. 21, 420. He voiced frustration that Lamictal was not working. He thought it was going to make all his symptoms go away. He reported that his doctor who did the brain scans told him that Lamictal was 80 to 90% effective. *Id.* The assessment indicated that he was tolerating Lamictal, but his mood was low and anxiety high. Tr. 421. He was continued on Lamictal and Klonopin and Celexa was added. It is noted that Plaintiff refused therapy stating: "I've done all that before and worked through all my problems." Tr. 421.

Plaintiff followed up with Sarkis on January 4 and 25, February 8 and 20, March 7, April 4, June 27, August 1 and 30, and October 10, 2012.[11]

---

[11] On January 4, 2012, Plaintiff reported that he was not sleeping well; he also admitted that he was not taking Klonopin as much (less than a couple days per week). Lamictal was increased and he was tolerating his meds well. Tr. 22, 422. On January 25, 2012, he reported feeling afraid of everything. Tr. 22, 424. On February 8, 2012, he reported that he talked to an old friend on the phone and also went out for coffee. It is also noted: "Felt free for the first time." Tr. 22, 426. In March and April 2012, it was noted that he was not doing well and wanted to isolate. Tr. 22, 430-33. In April 2012, his clinical global impressions severity was "severe," whereas it was "moderate" in June 2012. Tr. 433, 435. On June 27, 2012, he reported feeling better. He was able to work several hours on projects. Tr. 22, 434. In August 2012, he reported feeling pretty healthy and that he had filed for social security disability. Tr. 22, 436. Later in August 2012, he reported that he had been working part-time for a textbook company and was working on an Internet business. Tr. 22, 438. In October 2012, it was noted that his sleep was fair and he reported having a couple of "isolation days last week" and admitted he took Klonopin and experienced increased anxiety. It was noted that his

Tr. 21, 422-41.   Treatment primarily consisted of medication management.

*Id.*  Generally, his mental status exam findings were unremarkable

including normal thought process and speech in full orientation, except for

depressed mood, variable affect to flat affect to restricted affect, but

improved.   Tr. 21, 423, 425, 427, 429, 431, 433, 435, 437, 439, 441.   In

2012, he had mild to moderate impairment in attention and concentration;

he continued to deny any paranoia; and he continued to deny any side

effects from his medications.   Tr. 425, 427, 429, 431, 433, 435, 437, 440.[12]

---

clinical global impression of severity was moderate with marked improvement.   Tr. 22, 440-41.   On October 10, 2012, Elias Sarkis, M.D., completed a "Function Report – Adult Third Party" and remarked that Plaintiff "is a highly intelligent person who is unable to function in workplace [and] in society due to anxiety and mood [disorder]. Neuropsychological testing demonstrates great [not legible] in his ability to perform different tasks."   Tr. 412-49.   Plaintiff returned to Sarkis on November 29, 2012, and reported that he has some good days and some bad days.   Tr. 22, 492.   His mental status exam revealed he was fully oriented with normal thought process and normal speech; he had restricted affect and mild impairment in attention and concentration; and he continued to have moderate clinical global impression in severity, but with marked improvement.   Tr. 22, 492-93.   The ALJ gave Dr. Sarkis' 3rd party function report noted above "little weight as this provider is not in the position to observe these activities on a daily or even consistent basis to the extent that he is able to report on in this capacity.   Rather, these activities (or lack thereof) are more likely based upon the claimant's reports to his treating doctor.   Thus, the undersigned gives this report little weight."   Tr. 26; *see* Tr. 321-33 (Exhibit 3E), 442-49 (Exhibit 4F).

[12]   On February 15, 2012, Plaintiff was examined by Robert A. Erickson, M.D., for a comprehensive initial evaluation for long-term depression and hair loss.   Tr. 22, 388-401.   The ALJ reviewed the evaluation results noting in part: "He had normal physical, neurological and psychiatric exam findings except for flat moot and affect . . . He was given various supplements (versus medications) and dietary suggestions." Tr. 22 (citations omitted); *see* Tr. 390-91.   The ALJ noted that Plaintiff "had a positive reaction to the use of his medications at the time he was using Lexapro."   Tr. 25.

Plaintiff continued treatment at Sarkis in January, April, August, November, and December, 2013.  Tr. 23, 481-90.   On January 31, 2013, he reported doing "better than it used to be."  Tr. 23, 490.   On April 30, 2013, the assessment/plan indicated that he reported "doing well." Tr. 487.   "In August 2013, he had improvement with normal attention span/concentration judgment."  Tr. 23, 486 (citation omitted).   The ALJ noted that in August 2013, Plaintiff "reported he had been having seizures (that he did not mention at the hearing).   He also reported that he finished up his business plan."  Tr. 24, 486.   (citation omitted).   As of December 16, 2013, it is noted he was "doing better but not great."  Tr. 24, 481. Also, the ALJ noted that "his mental status exam findings were unremarkable including normal thought process, fear to normal memory, normal language, normal fund of knowledge and full orientation . . . except for down mood . . . with restricted . . . and anxious affect . . . ."  Tr. 23, 482, 484, 486, 488, 490 (citations omitted).

The ALJ considered additional treatment notes from Sarkis from 2014 and 2015.   Tr. 24-25.

> In 2014,the claimant continued to follow up with Sarkis Family
> Psychiatry but only on 3 occasions for medication management
> (May, August and November) (Exhibit 8F/13-18).   He  reported
> doing okay but was still having "a hard time getting out sometimes"

(Exhibit 8F/17). His mental status exam findings were unremarkable including normal thought process, fair to normal memory, normal language, normal fund of knowledge, normal judgment and full orientation (Exhibit 8F/13, 15, 17) except for restricted affect (Exhibit 8F/17). He had mild (Exhibit 8F/17) impairment in attention/concentration.

In August 2014, he reported that he was getting married. He also reported that Klonopin had been very effective (Exhibit 8F/15).

In November 2014, he returned to Sarkis Family Psychiatry and reported that he had him problems in last 3 weeks due to people taking advantage of him. He reported doing best with yoga. Medication regimen continued to include Lamictal and Klonopin (Exhibit 8F/13).

In 2015, he continued to follow up for medication management with Sarkis Family Psychiatry for which treatment consisted of medication management (January, February x 3, March, April, May, June and August) (Exhibits 8F/1-12, 11F). Generally, his mental status exam findings were unremarkable including normal thought process, fair to normal memory, normal language, normal fund of knowledge, normal judgment and full orientation (Exhibits 8F/4, 6, 8, 9, 11, 11F/1, 3, 5, 7) except for variable mood/affect from down mood (Exhibit 8F/2, 4, 8, 9, 11F/5), irritable mood (Exhibit 11F/3), constricted affect (Exhibits 8F/9, 11F/7) or stressed affect (Exhibit 8F/2). He had mild (Exhibit 8F/4, 6, 8) impairment in attention/concentration. His medication regimen still did not change as he continued to take Klonopin and Lamictal (Exhibits 8F, 11F) except Vyvance was added in June 2015 (Exhibit 11F/4).

On February 11, 2015, he reported "doing pretty good, stable" and less agoraphobic (Exhibit 8F/6).

He returned in March 2015 and reported that things were going well (Exhibit 8F/2).

On April 30, 2015, Dr. Sarkis completed a Medical Assessment to Do

Work Related Activities (Mental) and opined that the claimant had marked (defined as the limitation in the ability to function is serious. The limitation is more than "moderate" but less than "extreme") in the following areas: ability to relate to coworkers; ability to deal with the public; ability to use judgment; ability to function independently; ability to maintain attention/concentration and ability to relate predictably in social situations. He opined that she [sic] had extreme limitation (defined as the limitation in the ability to function is 100%. There is no useful ability to function) in his ability to deal with work stresses (Exhibit 10F) [Tr. 513-15].[13]

In May 2015, it was noted that he had poor compliance with treatment (Exhibit 11F/6).

On August 4, 2015, he returned to Sarkis Family Psychiatry and reported that he had been doing pretty good for the past couple of weeks. He also reported that he was doing well helping down at [his] shop (Exhibit 11F/1). Mental status exam revealed he was fully oriented with normal language, thought process, thought content, memory, concentration, and motor activity with appropriate judgment and insight but restricted affect and some halting speech (Exhibit 11F/1).

Tr. 24-25; *see* Tr. 464-481, 513-23.

Plaintiff argues that the ALJ did not give proper weight to Dr. Sarkis'

---

13   The ALJ expressly referred to Exhibit 10F, Dr. Sarkis' April 30, 2015, Medical Assessment to do Work-Related Activities (Mental), Tr. 513-15, and gave

no weight to portion of his opinion that noted marked limitation in multiple areas of functioning consistent with meeting listing level severity in light of the claimant's very own limited treatment with no hospitalizations since 2010. Furthermore, his opinion is inconsistent with his own treatment notes, which specifically noted that the claimant's examinations have generally been within normal limits with the bulk of exams showing normal memory, concentration, judgment and insight (as discussed in detail above in Exhibits 4F, 8F, 11F).

Tr. 27.

2015 opinion and did not identify the inconsistent evidence in the record.

*See* ECF No. 16 at 6, 8.   As noted above, on April 30, 2015, Dr. Sarkis

completed a medical assessment and opined that Plaintiff had moderate

ability to follow work rules and interact with supervisors; marked ability to

relate to co-workers, deal with the public, use judgment, function

independently, and maintain attention and concentration; and an extreme

limitation in dealing with work stresses.   Tr. 513-14.   He also stated that

Plaintiff had no significant limitations in understanding, remembering, and

carrying out simple job instructions.   Tr. 514.   He did find, however, that

Plaintiff had a marked ability to relate predictably in social situations and a

moderate ability to maintain appearance, behave in an emotionally stable

manner, and demonstrate reliability.   Tr. 515.

    The ALJ gave no weight to Dr. Sarkis' opinion.   *See supra* at n.13.

The ALJ found that the assessment of marked limitations, indicating listing

level severity, was inconsistent with Plaintiff's limited and conservative

treatment with medication and psychotherapy.   Tr. 27.   For instance, after

receiving treatment for a manic episode in 2010, Plaintiff did not seek

treatment from Dr. Sarkis until September 2011, Tr. 404, and had no more

than three sessions during that time period, August, September, and

October 2010, and May 2011 (once), with Dr. Jones.   Tr. 452-54.

The ALJ further found that Dr. Sarkis' opinion was inconsistent with his own treatment notes.   *See* <u>Crawford v. Comm'r of Soc. Sec.</u>, 363 F.3d 1155, 1159-60 (11th Cir. 2004).   The ALJ explained that Dr. Sarkis' treatment notes showed that Plaintiff's examinations have generally been within normal limits.   Tr. 27.   Although Plaintiff argues the ALJ did not identify the inconsistencies, the ALJ provided a detailed discussion of Plaintiff's treatment at Sarkis.   Tr. 20-27.

Furthermore, as noted above, throughout treatment with Dr. Sarkis in 2012, Plaintiff reported vacillating symptoms of depression and anxiety, but he had fairly normal mental status examinations, other than some impaired concentration and attention.   Tr. 422-41, 491-93.   Psychiatric examinations conducted between 2013 and 2015 generally showed a stressed and down mood; a cooperative attitude, normal orientation, speech, thought process, association; no psychotic symptoms; normal memory; normal to mildly reduced attention and concentration; and normal to mildly impaired judgment.   Tr. 465, 467, 469, 471-72, 474, 476, 478, 482, 484, 486, 48, 490, 516, 518, 520, 522.   During this time, Plaintiff reported symptoms of depression and anxiety with several periods of

improvement. Tr. 464-91, 516-23. These treatment records show no more than mildly impaired concentration at times, which supports the RFC that Plaintiff could concentrate efficiently to perform simple tasks. Substantial evidence supports the ALJ's determination to give no weight to Dr. Sarkis' opinion.

### Amen Clinics, Inc., and Robert M. Licata, M.D., a psychiatrist

On October 26, 2011, the claimant presented to Amen Clinics for evaluation with complaints of manic episodes, depression and anxiety (Exhibit 9F/1). Around 2006, the claimant reported that he stopped taking his Lexapro "cold turkey" and he then experienced a manic episode and spent an enormous amount of money in a very impulsive manner. To stabilize his mood, he was asked to return to Lexapro and he admitted that his mood and behavior had returned to "normal" (Exhibit 9F/2). He reported that in March 2010, he could no longer afford his medication and discontinued it again but within four weeks, began to feel nervous and restarted it. After one week, he had another manic episode (Exhibit 9F/2). During this manic episode, he was tasered by police after an exchange of words with another driver and had been Baker Acted. He admitted that his paranoia had subsided with the help of Abilify but still had depression and anxiety (Exhibit 9F/2). Mental status exam revealed rather normal findings. He had friendly attitude and normal behavior. He was fully oriented. Attention span was normal. Memory was intact. Judgment and insight were good. However, eye contact was poor and affect was flat. His mood was frustrated, depressed and hopeless (as reported) (Exhibit 9F/6). It was noted that brain SPECT studies were performed on 10/24/11 and 10/25/11, which revealed the most significant finding was severely increased activity in thalamus during concentration scan; increased activity in basal ganglia seen bilaterally most pronounced with concentration; decreased activity in the inferior orbits of the prefrontal corticals and the temporal lobes seen bilaterally in both areas and

most pronounced at rest accompanied by decreased internal cerebellar activity and irregular decreases in anterior poles in association with decreased activity in the temporal, parietal, occipital and posterior midline cerebellar areas that suggested trauma (Exhibit 9F/10-11). Robert Licata, M.D. (Staff psychiatrist) met with the claimant to review SPECT studies and for full neuropsychiatric evaluation. It was noted on this visit, his speech and thinking seemed "slow." He teared up when speaking of his shame. Diagnoses included anxiety, depression, mood disorder, anxiety disorder and learning disabilities (Exhibit 9F/12) with an assessed GAF of 50 (Exhibit 9F/13). Recommendations included lab work, nutritional supplements, mood stabilizer (Lamictal), psychotherapy and other brain healthy strategies as well as follow up with local professional (Exhibit 9F/13-16).

Tr. 20-21; *see* Tr. 496-512.[14]

---

[14] As of the October 24, 2011, evaluation, Plaintiff's occupation was listed as "independent insurance agent." Tr. 496. According to the employment history, no work-related problems are reported. Tr. 499. "Corry's employers/supervisors would say that he was concerned about the welfare of others, had a good work ethic, and was friendly." *Id. see* Tr. 501. The mental status examination results were generally normal including good judgment, no reported obsessions, SI, or HI; normal attention span and good insight, although his eye contact was poor and affect flat. Tr. 505. The brain SPECT studies were performed on October 24 and 25, 2011. *Id.* Plaintiff discontinued taking Cymbalta on October 12, 2011, and took his last Clonazepam on October 14, 2011. He discontinued taking his supplements on October 14, 2011. *Id.* The brain SPECT studies "show areas the brain that work well, areas of the brain that worked too hard, and areas of the brain that do not work hard enough. With this information, together with the clinical information obtained, we can develop a comprehensive treatment program." *Id.* The scan quality was good. *Id.* The scan results were provided. Tr. 505-06. His GAF score was 50. Recommendations included: "You have a good brain, but we can heal and balance it to make it better. Make one treatment intervention or change at a time." Tr. 508. Several laboratory recommendations are noted. *Id.* Nutritional supplements and medications are recommended. *Id.* The medical recommendation included: "Corry it is important that you be patient and remember that it will take several weeks before you experience the full impact of the treatment recommendations. Discuss with your psychiatrist any inclinations to reduce or discontinue your medications." *Id.; see* Tr. 508-11 for other recommendations.

On October 24, 2011, Dr. Licata conducted an evaluation of Plaintiff. Tr. 496-512. In addition to what is reported above, Dr. Licata also reviewed the brain SPECT imaging studies of October 24 and 25, 2011, that examined areas of the brain for signs of increased or decreased activity. Tr. 505-06. Dr. Licata interpreted the studies as being consistent with low mood and executive dysfunction, anxiety, mood disturbance, and emotional dysregulation. Tr. 507. Dr. Licata diagnosed bipolar disorder, anxiety, and learning disabilities. *Id.*

Although the SPECT studies confirmed Plaintiff's mental diagnoses, a diagnosis alone is insufficient to establish that the condition caused specific limitations. *See generally* Moore v. Barnhart, 405 F.3d at 1213 n.6. The SPECT study is not inconsistent with the RFC findings and does not sufficiently contradict the substantial evidence supporting the ALJ's decision.

Plaintiff argues the ALJ erred in not stating the weight he gave "to the objective findings of the SPECT studies and neuropsychiatric evaluation by Dr. Licata." ECF 15 at 7. The SPECT studies are not medical opinions, but objective testing. *See* Tr. 21; *see also* 20 C.F.R. § 404.1527(a)(2). Although the ALJ did not expressly state the weight he gave to Dr. Licata's

opinions and the SPECT studies, the ALJ considered the salient portions of the SPECT studies, the neuropsychiatric evaluation results, and Dr. Licata's opinions.   There is no showing that the ALJ overlooked any relevant evidence.   No error has been shown.

### Vicci L. Cascioli, R.N., A.P.

The ALJ noted that Nurse Cascioli wrote a letter and noted that Plaintiff had been receiving acupuncture for his anxiety and depression from January 2012 through September 2012 and January 2013.   Tr. 21. "She opined that he is unable to hold a job at this time and a good candidate for temporary worker's compensation.   She felt that with strong efforts, he would solve his problems and be able to work again."   *Id.* (citation omitted); *see* Tr. 456-57.   The ALJ gave Nurse Cascioli's opinion no weight "as this is from a non acceptable medical source," *see* 20 C.F.R. § 404.1513(a), and further noted Nurse Cascioli provided acupuncture and is not a specialist in the area of mental health.   Tr. 26; *see* 20 C.F.R. § 404.1527(c)(3)-(5).

Nurse Cascioli outlined her acupuncture treatment provided for Plaintiff, but did not provide any treatment notes or objective findings to support her opinion as noted by the ALJ.   Tr. 26, 456-57.   Nurse

Cascioli's opinion that Plaintiff was unable to work concerned an issue reserved to the ALJ. As such, the opinion was not a "medical opinion" under the regulations and not entitled to any particular weight. *See* Denomme v. Comm'r of Soc. Sec., 518 F. App'x 875, 877-78 (11th Cir. 2013) (unpublished). Furthermore, as noted by the ALJ, Nurse Cascioli is not an acceptable medical source and her opinion is not entitled to controlling weight. *See* Denomme, 518 F. App'x at 878. No error is shown.

## William E. Benet, Ph.D., Psy.D.

On February 19, 2013, Dr. Benet performed a psychological evaluation on Plaintiff and the ALJ considered Dr. Benet's psychological evaluation. Tr. 23-24; *see* Tr. 459-63.

> On February 19, 2013, the claimant presented to William Benet, Ph.D. for a consultative psychological exam (Exhibit 7F). He arrived in a pickup truck alone and presented ambulatory, tense and anxious looking who was also friendly and cooperative (Exhibit 7F/2). He reported having panic attacks since age 21 for which he had to temporarily withdraw from college but went back to graduate with a BA.[15] It was noted that he was vague about how often his panic attacks, when and where they occur (Exhibit 7F/3). He alleged that when he first started having panic attacks (age 21), "it was all I could do to get out the door." He also reported bipolar symptoms that began in 2006 that included euphoric and irritable mood, racing

---

[15] He graduated from Auburn University with a B.A. degree in interpersonal communications. Tr. 461.

thoughts, increased energy and activity, insomnia and decreased need for sleep with alternating episodes of depressed mood, social withdrawal and hypersomnia. He was also vague about the frequency and duration of manic/hypomanic and depressive episodes since 2006 (Exhibit 7F/3). He admitted that he had been feeling better since June 2012 (Exhibit 7F/3). With regard to his prior mental health history, he reported being tasered by police in 2010 at which time he was placed at Shands involuntarily under Baker Act. He then was readmitted to Vista and saw Dr. Tran on an outpatient basis. He started in the fall of 2011, he was seen at Amen Clinic in Virginia for 2-3 days and then when he returned home, he began treating with Dr. Sarkis. He also reported being vague about his drinking but stated that he last used in 2010. He also reported that he quit smoking cigarettes the year before and was smoking an e-cigarette. He reported history of DUI in July 2010. He reported one month later, he was arrested for fleeing law enforcement officers (Exhibit 7F/3). He reported that he attended acupuncture school in Gainesville for 1 1/2 months (Exhibit 7F/4). He reported that he was trying to start an online jewelry business but did not have a website. He reported that he lived in a 3 bedroom house owned by his parents but sometimes stayed with his girlfriend (Exhibit 7F/4). Mental status exam revealed he was fully oriented who was casually and neatly dressed and groomed. His gait was normal. Although he appeared tense and anxious, he was polite and friendly and cooperative. Speech was clear.

Thinking was organized. Mood was tense and anxious. Attention and concentration were adequate. Memory was intact. Judgment and insight were adequate (Exhibit 7F/5). Diagnoses included bipolar disorder without psychotic features and panic disorder without agoraphobia (Exhibit 7F/5) with an assessed GAF of 50 (Exhibit 7F/6). Dr. Benet opined that the claimant "should be able to perform work-related mental tasks involving understanding and memory, but is likely to have moderate to marked difficulty performing tasks involving sustained concentration and persistence, social interaction and adaption" (Exhibit 7F/5).

Tr. 23-24.

The ALJ further considered Dr. Benet's evaluation and concluded:

> As for the GAF score of 50 given by Dr. Benet noted in the consultative exam, the undersigned gives this no significant weight as it is based upon limited treatment and inconsistent with the noted normal examinations by Dr. Sarkis, particularly with regard to his more recent medical treatment. Moreover, his overall treatment has been rather conservative as his medication regimen has remained relatively unchanged as it has consisted of Lamictal and Klonopin for most of 2014 and throughout 2015.

Tr. 27.

Dr. Benet was not a treating provider so his opinion was not entitled to controlling weight. 20 C.F.R. § 404.1529(c); Denomme, 518 F. App'x at 878. Further, the stated limitation in concentration was inconsistent with Dr. Benet's examination of Plaintiff, Tr. 462, as well as the examinations conducted by Dr. Sarkis and Plaintiff's overall conservative treatment. *See, e.g.*, Tr. 27, 465, 467, 469, 471-72, 474, 476, 478, 482, 484, 486, 488, 490, 516, 518, 520, 522; *see* 20 C.F.R. § 404.1527(c)(3)-(4); Crawford, 363 F.3d at 1159-60. Substantial evidence supports the ALJ's decision to reject the limitations offered by Dr. Benet.

### Wendy Silver, Psy.D.; Michele Quiroga, Ph.D.

"On February 22, 2013, DDS mental health specialist, Wendy Silver, Psy.D. reviewed the available medical evidence and opined that the

claimant's anxiety disorder was severe as it caused moderate limitations in concentration, persistence and pace (Exhibit 7A, duplicated at 8A)." Tr. 24, *see* Tr. 117-34.

"On November 20, 2012, DDS mental health specialist, Michele Quiroga, Ph.D. reviewed the available medical evidence and opined that the claimant did not have any severe mental impairment as her [sic] anxiety and affective disorders only caused mild limitation in concentration, persistence and pace (Exhibit 1A, duplicated at 2A)." Tr. 22; *see* Tr. 97-112.

> The ALJ gave the opinions of Drs. Silver and Quiroga
>
> significant weight as they are consistent with the overall credible evidence of record and show that the claimant is capable of simple, routine tasks and unskilled work. Thus, mentally, he is precluded from the performance of complex tasks but is capable of completing simple, routine tasks consistent with unskilled work with concentration for those tasks for 2 hour periods and normal breaks and a lunch.

Tr. 27.[16]

---

[16]    Dr. Silver opined that Plaintiff "retains the ability to perform simple, repetitive and some higher level tasks." Tr. 124. *See* Hurst v. Comm'r of Soc. Sec., 522 F. App'x 522 (11th Cir. 2013) (unpublished) ("capable of simple, routine, repetitive tasks"); Jacobs v. Comm'r of Soc. Sec., 520 F. App'x 948 (11th Cir. 2013) (limited to "one to three step non-complex tasks"); Washington v. Soc. Sec. Admin., Comm'r, 503 F. App'x 881, 883 (11th Cir. 2013) (unpublished) ("limited to performing only simple, routine[,] repetitive tasks with up to three-step demands, and only occasional changes in the work setting, judgment, or decision making"); Scott v. Comm'r of Soc. Sec., 495 F. App'x 27, 28-29 (11th Cir. 2012) (unpublished) ("low stress, simple, unskilled; one, two, or three

State agency consultants are highly qualified specialists who are also experts in the Social Security disability programs and their opinions may be entitled to great weight if the evidence supports their opinions.   *See* 20 C.F.R. § 404.1527(e)(2)(i).   The ALJ may rely on the opinions of State agency medical consultants after discounting the opinions of other physicians based on the record as a whole.   *See, e.g.*, <u>Forrester v. Comm'r of Soc. Sec.</u>, 455 F. App'x at 902-03 (holding ALJ "did not err by relying on the opinions of the non-treating physicians, taken alone, in a way that left [his] decision unsupported by substantial evidence" and ALJ was not prohibited from reaching conclusion "simply because non-treating physicians also reached it" (citation omitted)).   The opinions of Drs. Silver and Quiroga are consistent with the ALJ's RFC finding.

## IV.

Plaintiff requests this Court to re-weigh the evidence and substitute its discretion for that of the ALJ.   <u>Bloodsworth</u>, 703 F.2d at 1239.   As

---

step instructions"); <u>Rosario v. Comm'r of Social Sec.</u>, 490 F. App'x 192, 195 (11th Cir. 2012) ("simple, routine, and repetitive tasks in an environment with only brief interactions with co-workers and public"); <u>Forrester v. Comm'r of Soc. Sec.</u>, 455 F. App'x 899, 903 (11th Cir. 2012) (unpublished) ("simple, routine, and unskilled work"). In the cited cases for the most part, the administrative records reflected opinions from state agency consulting physicians that these plaintiffs were capable of "simple routine tasks."

stated above, the role of a reviewing court under 42 U.S.C. § 405(g) is limited to determining whether substantial evidence in the record as a whole supports the decision.   As long as the ALJ's decision is supported by substantial evidence and based upon correct application of the law, as it is in this case, it is entitled to deference and should be upheld. After discussing the medical evidence, the ALJ noted the "[r]eview of the medical evidence is rather limited."   Tr. 25.   Nevertheless, the ALJ analyzed the evidence, including objective medical evidence and limited treatment, and provided the weight given to most of the opinions.   Tr. 18-26.

Although Plaintiff argues that the RFC must be based on a treating or examining physician's opinion, this argument has been rejected.   *See, e.g.*, Castle v. Colvin, 557 F. App'x 849, 853-54 (11th Cir. 2014) (unpublished) (holding the ALJ's RFC findings are supported by substantial evidence when he gave a physician's opinion little weight even though the record lacked another physician's assessment); *see also* Green v. Soc. Sec. Admin., 223 F. App'x 915, 923-24 (11th Cir. 2007) (unpublished) (holding the ALJ's RFC findings are supported by substantial evidence even though he gave a physician's opinion no weight and the only other

evidence besides the claimant's testimony was office visit records that did not refute a finding that the claimant could perform light work).

Substantial evidence supports the ALJ's RFC determination, his consideration of the medical evidence, and Plaintiff's credibility.   No error has been shown.

## V.   Conclusion

Considering the record as a whole, the findings of the ALJ are based upon substantial evidence in the record and the ALJ correctly followed the law.   Accordingly, pursuant to 42 U.S.C § 405(g), the decision of the Commissioner to deny Plaintiff's applications for Social Security benefits is **AFFIRMED.**   The Clerk shall enter judgment for Defendant.

**IN CHAMBERS** at Tallahassee, Florida, on November 17, 2017.

**s/   Charles A. Stampelos_____**
**CHARLES A. STAMPELOS**
**UNITED STATES MAGISTRATE JUDGE**